STEVEN M. WEINBERG (SBN 235581)
smweinberg@holmesweinberg.com
SHARONI S. FINKELSTEIN (SBN 271829)
sfinkelstein@holmesweinberg.com
HOLMES WEINBERG, PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265
Tel: (310) 457-6100
Fax: (310) 457-9555

Attorneys for Plaintiff
Masterfile Corporation

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| MASTERFILE CORPORATION, | Case No. 12-CV-00850 R (Ex) |
|---|---|
| Plaintiff, | **DECLARATION OF MARYBETH PETERS, FORMER REGISTER OF COPYRIGHTS, IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN LIEU OF ANSWER** |
| v. | |
| CHAGA INTERNATIONAL, a Nevada corporation; STEVE GOULD, an individual; and MICHAEL TIDD, an individual, | |
| Defendants. | |

I, Marybeth Peters, hereby declare:

1. I have been a licensed attorney since 1973 and admitted in the District of Columbia. From 1994 through December 31, 2010 I was the Register of Copyrights, U.S. Copyright Office, Library of Congress. In my 45 year career at

- 1 -

the Copyright Office I served as an examiner, senior examiner, senior attorney, Chief of the Information and Reference Division and Chief of the Examining Division, Policy Adviser to the Register, and Acting General Counsel. I currently am "Senior Counsel" at the law firm of Oblon, Spivak, McClelland, Maier & Neustadt, L.L.P. in Alexandria, Virginia. I have personal knowledge of the matters set forth in this Declaration and could and would testify truthfully regarding them, if called upon.

2. I am submitting this Declaration in opposition to Defendants' Motion for Summary Judgment in Lieu of an Answer to Plaintiff's Complaint. This Declaration seeks to provide the Court with the factual background relating to the policies, procedures and rules of the Copyright Office (which I sometimes refer to as the "Office") relating to the registration of stock photo library compilations, including the individual photographs, which the law recognizes as contributions to a collective work and the decisions made by me as Register relating to such registrations. I also address why the interpretations given to Sections 409 and 411 of the Copyright Act by the courts in *Muench Photography, Inc. v. Houghton Mifflin Harcourt Publ'g Co.*, 712 F.Supp.2d 84 (S.D.N.Y. 2010), *Bean v. Houghton Mifflin Harcourt Publ'g Co.*, 2010 WL 3168624 (D. Ariz. Aug. 10, 2010), and *Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, 2010 U.S. Dist. LEXIS 108041 (D. Alaska 2010) were incorrectly decided.

3. The Register of Copyrights is given broad authority to carry out the duties specified in Title 17, U.S. Code (the copyright law). These duties are found in various provisions dealing with registration of claims to copyright, recording documents, such as assignments and notices of termination, administering various compulsory licenses as well as activities spelled out in Section 701.

4. For the record, I am providing a brief overview of the formal requirements for securing a federal copyright from 1790 to 1989 and background

and philosophy of the Office during the revision of the 1909 Act and the subsequent implementation of that act following enactment in 1976, I am also providing the view of the Office with respect to registration under the 1976 Act. The information provided by here is personally known by me as a result of my long tenure in the Copyright Office including as Register, that being the most senior position in the Copyright Office.

5. The first federal copyright law, enacted in 1790, like the British law of 1710, the Statute of Anne, included formal requirements for authors. These laws set the tone for future copyright laws for many years – two terms of copyright, an original and a renewal term, and a number of formalities. These included registration, inclusion of a copyright notice on published copies, deposit of published copies, recording an assignment, manufacture of a book in the U.S. and to secure a second term, a timely renewal registration. Failure to comply with a number of these formalities placed works in the public domain. Many, many works lost copyright protection because of noncompliance.

6. Until the late 1800's the United States did not look beyond its borders; it was an isolationist. However, in 1886, the Berne Union and the Berne Convention came into being. The U.S. did not join the Berne Convention. Great Britain did. In 1908 the Berne Convention was amended to prohibit formalities. The British law of 1911 abolished formalities. U.S. kept its formalities. Over the years there were efforts to adhere to the Berne Convention; however, they were unsuccessful.

7. Lack of international protection in many countries of the world was a problem for the U.S. especially after World War II. The United States realized that a new convention that provided protection in many countries throughout the world but didn't require countries that had formalities to remove them was critical. Consequently the U.S. lead an effort that resulted in the creation of such a

*DECLARATION OF MARYBETH PETERS*

convention, the Universal Copyright Convention (UCC), concluded in 1954. It was a lower level convention than Berne, that is, the requirements were less stringent and importantly it allowed countries to keep their formalities. To not burden countries, i.e., to not make them comply with the formalities of other countries, the convention included a provision providing that formal requirements, in countries other than the country of origin of a work, would be satisfied by inclusion of a UCC notice which was to be placed in a reasonable location on copies of works. The notice consisted of the symbol c in a circle, followed by the statement, "under the UCC," the date of first publication, and the name of the copyright owner. U.S. law was amended to incorporate this provision.

8. In 1955 the U.S. Congress appropriated funds to the Copyright Office for a comprehensive program of research marking the beginning of a serious effort to update the formality laden, print based 1909 copyright law. Ultimately thirty five studies were produced on the major problems and issues. These studies prepared by eminent copyright professors and lawyers and by staff of the Copyright Office along with accompanying comments by interested lawyers and scholars were published by the Senate Judiciary Subcommittee on Patents, Trademarks and Copyrights in 1960. In 1961 the Register of Copyrights issued his report on revision. This was followed by a series of meetings with a panel of consultants, representatives of the interested parties and the bar and the Copyright Office. Bills were introduced in 1964 and the efforts to enact legislation continued until October 19, 1976, when a new law was enacted, effective January 1, 1978.

9. There were many changes, many profound and fundamental, but key was removing formal requirements that placed works in the public domain. First, common law and state copyright laws and laws that provided protection equivalent to copyright were preempted. Copyright protection began on creation and fixation of the work in a copy and vested automatically in the author. Some formal

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

1 requirements were maintained but failure to comply with them in most cases did 2 not result in forfeiture of the copyright  Reducing formalities was a goal of 3 Register Abraham Kamenstein and Assistant Register (later Register) Barbara 4 Ringer.  Their goal was to get U.S. law closer to the requirements of the Berne 5 Convention.  Some of these changes focused on the notice of copyright, the deposit 6 of copies for the Library of Congress and registration.  For example, notice was 7 required but failure to publish with a notice could be cured if done within 5 years 8 of publication without a notice.  The mandatory deposit requirement of copies for 9 the Library was separated from the registration process and the effect of failure to 10 deposit was a monetary fine – not loss of copyright.  Registration was voluntary 11 except in the case of infringement; timely registration, however, was required for 12 the extraordinary remedies of statutory damages and attorneys' fees.  The 13 enactment of the 1976 law was the beginning of an era in which formalities that 14 had been part of the copyright law since 1790 were intentionally removed.

15     10. On January 1, 1978 the Copyright Office had in place new regulations 16 and new forms for registration.  A new seal for the certificate of registration was 17 designed.  The law provided that a  certificate of registration for a basic, as 18 opposed to a supplementary registration, if made within 5 years of publication, was 19 entitled to prima facie evidence of the validity of the copyright and of the facts 20 appearing on the certificate. Basic registration is the initial registration.  However, 21 the Office (and the law) provide for placing corrections and amplifications 22 concerning a basic registration on record.  Form CA is used for supplementary 23 registrations; after approval for registration, a certificate is issued in the class of the 24 original registration, e.g., Class VA for works of the visual arts.

25     11. From the beginning, the philosophy of then Register Barbara Ringer 26 to the present, including throughout my tenure as Register, has been the same. 27 Registration is a good thing for the copyright owner and the public.  The rule was

28

**HOLMES WEINBERG PC**
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

and is that for registration to be made the application must contain: (1) the title of a work (in a collective work or compilation, that title is the collective title, not the title of individual works contained in the collection or compilation); (2) the name of the author of the work (for a collective work or compilation, it is the author of the compilation, and the names of the authors of individual works within the collective are not required); (3) if the work was published, the date and place of publication (although if the eligibility of the work is obvious because of the citizenship of the author and the place of publication is not given, the place of publication is not required); and, finally, (4) if the work contained previously published material or was a compilation, there needed to be a brief general statement of the authorship.

12. Another philosophy and practice of the Office was and continues to be to encourage registration. Therefore, from the beginning, the Office would register claims even if additional information, such as additional authors, were listed on the published copies of work but not listed on the application form. Even though additional information might be desirable, if not given, it would not necessarily hold up registration. I believe the Register relied on the fact that a supplemental registration could be made if the copyright claimant believed that was desirable. Many supplementary registrations have been made adding authors, adding statements of the material covered by the claim, correcting dates of publication, etc

13. Finally, in 1989 the U.S. adhered to the Berne Convention and any remaining formalities that interfered with the exercise or enjoyment of the copyright in a work were removed. With respect to registration, registration continues to be required for owners of "United States works," as defined in 17 U.S.C. 101, who wish to bring a civil action for copyright infringement. All others may file a civil suit and litigate without a registration.

14. In my role as Chief of the Examining Division, 1980–1983, and then Policy Adviser to the Register, 1984–1994, I became aware of the difficulties that photographers were experiencing in trying to register their photographs. This came to the forefront in 1992 with the introduction of a copyright reform bills in both the House and the Senate followed by hearings in which the Association of Media Photographers (ASMP) participated and discussed their concerns with members of the IP Subcommittee in the House and the Judiciary Committee in the Senate. In response to these bills, the Librarian of Congress, convened a blue ribbon advisory panel (ACCORD) headed by former register Barbara Ringer and Robert Wedgeworth, then University Librarian at University of Illinois at Urbana and former Executive Director of the American Library Association, to study the registration and deposit provisions of the law and the practices of the Copyright Office and the Library of Congress related to these provisions.

15. In August, 1994 I became the Register of Copyrights. One of my earliest actions was to begin a series of meetings with photographers and their representatives. The goal was to identify the impediments that photographers faced in trying to register their works. Beginning in 1995, many meetings were held with ASMP and the Picture Agency Council of America ("PACA"), the trade organization in North America for stock image libraries like Masterfile. A variety of possible solutions were discussed and implemented. Most of these were in accordance with existing regulations that allowed group registrations for multiple works and which easily could be interpreted to apply to catalogs like those of Masterfile. With respect to group registrations, which were authorized by section 408 of the law, the House Report for the 1976 law cited the need to give the Register flexibility with respect to the deposit and registration provisions of the law and identified a problem with the 1909 laws' requirement of separate registrations for each photograph, stating it had created unnecessary burdens and

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

expenses on authors and owners as well as creating administrative problems for the Copyright Office.

16. In 2001 a new group registration regulation was adopted allowing individual photographers to register all their photographs published within a single year with one application. This has been very successful for individual photographers, but not helpful to those who have catalogs or databases of licensable photographs, like Plaintiff Masterfile. Group registration for image libraries and databases of thousands of photographs in a single, updatable registration makes sense for the Copyright Office as well as for the authors and other copyright owners. As Register of Copyrights, I believed, and I continue to believe, that the regulations and practices that were adopted permitting this practice of updatable single group registration for image catalogs in their various media (print, online, etc.) are consistent with the law and its philosophy, and certainly fell within my jurisdiction and authority as Register.

17. By 1997 many members of PACA and ASMP were registering their works in accordance with statements that are set out in Nancy E. Wolff's accompanying declaration. The article she published for PACA members in 1995 is accurate and the letter sent to her by Nanette Petruzzelli, the Chief of the Examining Division and later Associate Register for Registration, also are accurate and consistent with the policies, procedures and regulations under the Register's authority.

18. With respect to catalogs or databases consisting of photographs, the analysis is similar. There may be a claim in compilation authorship, i.e., the selection, arrangement or coordination such that the work as a whole constitutes an original work of authorship. These compilations clearly contain a number of contributions that are separate and independent works in themselves, that have been assembled into a collective whole, and when owned by the claimant of the

catalog or database are clearly covered by the single compilation/collective work registration. When catalogs or databases are registered, the title of the work being registered is the collective title and **only** that title. Individual works do not need to be identified and individual authors to not have to be identified. A claimant can however include as much information concerning the individual works contained in the collective work as he or she wants. Indeed, many of the registrations issued in this case include the names of all of the authors of the individual works. The only information not provided is the titles of the images tied to the names of the individual authors. The relatively new Copyright Office online system makes giving all of this information possible; however, it is not required. That system is still a work in progress and issues still need to be resolved in order to make registration an easier task for everyone.

19.  The Register of Copyrights has a great deal of discretion in the area of registration and deposit of copyrighted works. She promulgates regulations and approves practices. The Compendium of Copyright Office Practices ("Compendium II") is based on decisions that have been made and approved by the Register. That document is in the process of being updated, and many of the sections that were finalized in 1984 have not been updated. However, practices not covered in Compendium II have been approved by the Register for use by the staffs of the three Copyright Office registration divisions. Group registrations, of which there are many, including the rules for automated databases, are embodied in regulations. 37 C.F.R. § 202.3.

20.  Section 409 of Title 17, "Application for copyright registration," provides that the application shall include "the title of the work, together with any previous or alternative titles, under which the work can be identified." The title of a compilation or collective work is the collective title. Compendium II at § 308.03. Where the copyright claimant in a collective work is also the owner of all rights in

*DECLARATION OF MARYBETH PETERS*

a particular contribution, the author of that contribution may be included but it is not required. Only the author of the collective work is required.

21. The registered claim to copyright in a collective work extends to all of the component parts of the work that are copyrightable and in which the applicant is the owner of all rights, i.e., the claimant. Compendium II § 108.04. This is true even if the individual works are not clearly identified as being within the claim. Should there be any doubt about the scope of the claim because of limited information in the basic information, the claimant *may* supplement the registration by submitting an application for supplementary registration, but such supplementation is not required. Such a registration is acceptable for not only clarifying the extent of the claim but adding or deleting authors. See Compendium II §§ 1507.05 and 1507.09.

22. During my tenure as Register I approved many, many registrations for compilations of images which also covered the individual images. Indeed millions of photographic images are covered by such registrations.

23. Registration and its effect can be misunderstood, and over the years the Copyright Office was asked to deal with a number of cases where a court had invalidated a registration because of issues such as a charge of fraud on the Copyright Office or failure of a certificate to disclose preexisting material incorporated into the registered work. The Office prepared and sent letters explaining the law and the practices of the Office and the registrations were eventually deemed valid.

24. In 2008 the law was amended to clarify such issues. Specifically, a new subsection (b) was added to section 411 and the former subsection (b) became subsection (c). It states that a certificate of registration satisfies the pre-suit registration requirement of section 411(a) unless the defendant demonstrates **both** (1) inaccurate information was included in the application with knowledge that it

1 was inaccurate and (2) the inaccuracy of the information, if known, would have
2 caused the Register to refuse registration. This is a codification and also a
3 significant extension of the "innocent error rule" established in case law and in the
4 Ninth Circuit. Clearly the intent of this amendment – and as Register I was
5 involved directly in this amendment – was to remove a defense that mistakes or
6 omissions in an application for registration require dismissal of infringement
7 actions.

8     25. Masterfile followed the regulations, practices and advice of the
9 Copyright Office. Registrations were issued bearing my name as Register. I
10 believe the registrations are valid. Any doubt about this should be considered in
11 light of section 411(b) which makes it clear that registrations made in good faith
12 and which the Register of Copyrights believe are appropriate should be upheld.

13     26. Finally, for all of the reasons stated above, I believe the
14 interpretations of sections 409 and 411 of Title 17 by the courts in *Muench*
15 *Photography, Inc. v. Houghton Mifflin Harcourt Publ'g Co.*, 712 F.Supp.2d 84
16 (S.D.N.Y. 2010), *Bean v. Houghton Mifflin Harcourt Publ'g Co.*, 2010 WL
17 3168624 (D. Ariz. Aug. 10, 2010), and *Alaska Stock, LLC v. Houghton Mifflin*
18 *Harcourt Publ'g Co.,* 2010 U.S. Dist. LEXIS 108041 (D. Alaska 2010) cited in
19 Paragraph 2 above, were incorrect and therefore the cases were wrongly decided.

20
21 //
22 //
23 //
24 //
25 //
26 //
27 [signature on following page]
28

**HOLMES WEINBERG PC**
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

I declare under penalty of perjury that the forgoing is true and correct. Executed this  16th  day of May, 2012, at Alexandria, Virginia.

*Marybeth Peters*
Marybeth Peters